UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>V.<br><br>EDMUND WALKER CHANEY,<br><br>    Defendant. | CRIMINAL ACTION NO. 5:15-17-KKC<br><br><br>**MEMORANDUM<br>OPINION AND ORDER** |

*** *** ***

Edmund Walker Chaney is charged with federal firearms violations, including possession of a machinegun. He filed a motion to suppress all evidence seized from the location of his arrest (DE 12), and on June 15, 2015, the Court held an evidentiary hearing (DE 16). At the conclusion of the evidentiary hearing, the Court denied Chaney's motion for the reasons stated below.

**I. FACTUAL BACKGROUND[1]**

In November 2014, the Lee County Sheriff's Department ("LCSD") conducted an investigation to recover a stolen Ford F250 pick-up truck and enclosed trailer. LCSD received information that the truck was located on property off Larson Road; therefore, LCSD dispatched Deputy Matt Eversole to determine whether he could find the truck.

Larson Road is a rural road in a mountainous area of Eastern Kentucky, but Deputy Eversole knew the area well because he routinely patrolled numerous oil rigs off Larson Road. The owners of the oil rigs asked LCSD to monitor their rigs. The owners gave open-ended consent to LCSD to enter their properties, examine the oil rigs, and perform other

---

[1] All of the foregoing facts were established during the June 15 evidentiary hearing.

necessary duties. Therefore, Deputy Eversole began his search for the stolen truck on a property that he knew—property containing Charles Booth's oil rigs.

While on Booth's property, Deputy Eversole saw a truck matching the description of the stolen Ford F250. He knew that the truck was on the property of Booth's neighbor and that LCSD did not have open-ended consent to enter the neighbor's property. Deputy Eversole did not know who owned the neighboring property; therefore, he returned to Larson Road, drove his patrol car to the entrance of the quarter-mile long driveway leading into the neighbor's property, and awaited further instructions.

The entrance to the neighbor's property had a gate, and the gate was locked to prevent any cars from entering the driveway. The gate stood alone at the entrance to the property; a fence did not enclose the property. Deputy Eversole waited outside the locked gate.

LCSD Sheriff Wendell Childers arrived. Deputy Eversole described what he saw from Booth's property, and Sheriff Childers instructed Deputy Eversole to contact the county attorney. The property owner, Lacy Tipton, and two females then approached the gate. The females informed Sheriff Childers and Deputy Eversole that two men and a child remained on the property; Sheriff Childers took the women aside. Once Tipton identified himself as the property owner, Deputy Eversole explained why the officers were at the gate and asked Tipton for consent to search the property. He consented. Tipton also aided Deputy Eversole in completing the LCSD consent-to-search form and described the property in detail to Deputy Eversole.

While Deputy Eversole spoke with Tipton and completed the consent-to-search form, Harrison Bush drove down the driveway to the gate. At this time, a number of LCSD officers, Tipton, and the women were outside the gate; Bush was inside the gate. Bush

informed the officers that the child remained on the property and he believed that the child was in danger because the remaining individual on the property, Edmund Chaney, was heavily armed.

The officers entered the property because they had received Tipton's consent to search the premises and they feared that a child may be in danger. Bush offered to drive a number of LCSD officers in his vehicle up the driveway to the structure where he claimed he had left the child with Chaney. Tipton offered to take Deputy Eversole and Constable Jonathan Shuler on a "shortcut" through an off-roading path so that they could reach the structure faster. The shortcut was not faster. Other LCSD officers arrived at the structure first; Chaney ran. Tipton, Deputy Eversole, and Constable Shuler intercepted Chaney as they approached the structure. Deputy Eversole detained Chaney and—once secured—another LCSD officer brought Chaney down the driveway to the officers' vehicles. Bush and the other officers located the child.

All present also smelled a strong odor emanating from the structure on Tipton's property. Constable Shuler presumed that the odor came from a methamphetamine laboratory because (1) the odor mirrored what, in his experience and training, a methamphetamine laboratory would produce; (2) he noted that the structure was built like and strategically secluded like other methamphetamine laboratories; and (3) he had been involved with the investigation and prosecution of other methamphetamine laboratories in the vicinity and knew that there were other, undiscovered, laboratories.

Deputy Eversole, Constable Shuler, and Tipton approached the structure. Constable Shuler knew that methamphetamine laboratories are volatile, and he was concerned for the safety of everyone present. As the three men approached the structure, the officers noticed a number of firearms. The three men entered the structure. The officers saw an SKS

machinegun, rifles, and handguns. Constable Shuler also discovered that the odor emanated from an operating moonshine still, not a methamphetamine laboratory. Deputy Eversole continuously verified that Tipton consented to the officers' actions, and Tipton consistently provided consent to search the structure and other secured locations on the property. Tipton disabled the moonshine still and told the officers who owned which firearm. Later, he brought the officers to a separate residence away from the structure on the property that he shared with Chaney. Tipton completed a second consent-to-search form for the residence, and he gave the officers keys to the gate so that the officers could return to the property and to the structure with the moonshine still.

## A. Conflicting Testimony

At the evidentiary hearing, Chaney called Tipton as a witness. Tipton clarified that he is Chaney's uncle, and Tipton claimed that he never provided consent to search his property. He asserted that he never signed a consent-to-search form before the officers initially entered the property, he contended that the child was in Bush's vehicle throughout the incident, and he claimed that he never signed a form until the officers searched his residence. Tipton also stated that the consent-to-search form was blank when he was forced to sign it.

## B. The Court's Credibility Finding

The Court does not find Tipton's testimony credible. *See generally Davis v. Alaska*, 415 U.S. 308, 316 (1974) (discussing how revealing biases, prejudices, and ulterior motives damage a witness' credibility); *United States v. Bailey*, 407 F. App'x 27, 28 (6th Cir. 2011) (noting that during evidentiary hearings, "[t]he district court is in the best position to judge the credibility of witnesses"). First, Tipton's testimony is inconsistent and implausible. He alleges a wide-spread conspiracy that is uncorroborated by any other witness at any time.

4

Second, Tipton's testimony is not motivated by the truth. He was exposed to significant legal liability for the objects and activities on his property, and he—no doubt—feels remorse that his nephew incurred some legal liability, too. Third, Tipton's testimony is not supported by any other physical or testimonial evidence. *See United States v. Martin*, 526 F. App'x 643, 648 (6th Cir. 2013). Fourth, Tipton's behavior during the search is inconsistent with his testimony. He was present throughout the search and often assisted the officers. Finally, Tipton provided officers with a key to his property so that they could later return. This act is completely inconsistent with a claim that he did not consent to the officers' presence and search of his entire property. *See United States v. Allen*, 155 F. App'x 229, 231–32 (6th Cir. 2005).

**II. ANALYSIS**

The United States presents two theories for admitting the evidence seized during Chaney's arrest—consent and exigent circumstances. The evidence is admissible under either theory.

**A. Consent**

A search conducted pursuant to voluntarily obtained consent is a well-recognized exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "The government bears the burden of proving, through 'clear and positive testimony' that the consent to search was voluntarily given." *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011) (quoting *United States v. Salvo*, 133 F.3d 943, 953 (6th Cir. 1998)). The following factors guide courts to determine whether the consent to search was voluntarily given: (1) the age, intelligence, and education of the consentee; (2) whether the consentee knew he or she had the right to refuse consent; (3) the length and nature of the detention; (4) whether the police used coercive or punishing

5

conduct; or (5) other indicia of "more subtle" forms of coercion that would alter the consentee's judgment. *United States v. Cochrane*, 702 F.3d 334, 342 (6th Cir. 2012).

Here, the United States introduced two different consent-to-search forms signed by Tipton. Tipton now claims that he did not voluntarily sign the consent forms; however, the Court finds his testimony not credible. Deputy Eversole stated that he told Tipton that he did not have to consent to the search, and Deputy Eversole continuously sought Tipton's verification for consent to search locations. The Court also notes that the testifying officers declared that (1) the officers did not enter the property until Tipton signed the first consent form; (2) Tipton was present throughout the search of the property, but he never withdrew his consent and, in fact, often assisted the officers in finding additional information; and (3) Tipton was extremely cooperative at the time and gave the officers keys to the property.

Chaney asserts that Tipton's signatures on the two consent-to-seach forms are inconsistent. Chaney contends that such inconsistency indicates that the officers fabricated one or both of the forms. The Court, however, finds this argument not credible. The officers stated that Tipton signed the first consent-to-search form outside the gate of his property; he signed the second consent-to-search form in his residence. It is logical that these two signatures would look dissimilar because Tipton signed the forms on very different surfaces. A signature made outdoors without a hard, flat surface will look different than a signature made indoors on a stable surface.

Accordingly, the Court finds that—at the time of the search—Tipton gave voluntary consent to search the property. Tipton understood the consent-to-search form, he knew that he could refuse consent, and the officers did not engage in *any* coercive behavior. *See Cochrane*, 702 F.3d at 342. The consent-to-search form stated that Tipton consented to a

search of the entire premises. He never revoked his consent and, in fact, often aided the officers.

**B. Exigent Circumstances**

Another well-recognized exception to the Fourth Amendment warrant requirement applies when "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013) (internal quotations omitted). To determine whether a law enforcement officer faced an emergency that justified proceeding without a warrant, courts must perform a case-specific, totality-of-the-circumstances analysis. *Riley v. California*, 134 S. Ct. 2473, 2486 (2014). Sufficient emergencies include the need "to assist persons who are seriously injured or are threatened with imminent injury" or to disable "immediately dangerous instrumentalit[ies], such as explosives . . . ." *Id.* at 2494.

Here, there were two different emergencies that, chronologically, intersected. First, the officers feared for the safety of the child. Bush informed the officers that a child remained on the property with a heavily armed individual, Chaney. Bush's specific comments—including whether he indicated that the heavily armed individual had been firing the weapons—are unclear, but the officers' testimony unequivocally established that everyone at the gate feared for the child's safety. The fear was so palpable that Tipton took Deputy Eversole and Constable Shuler on a "short-cut." The totality of the circumstances demonstrated that the officers had an objectively reasonable justification to enter the property. *See Riley*, 134 S. Ct. at 2494.

Second, as soon as the officers arrived in the vicinity of the structure, they smelled a strong odor that, in their training and experience, mirrored a methamphetamine

laboratory. The officers also knew that methamphetamine laboratories are extremely volatile, and that everyone present was in danger because the laboratory could explode. Therefore, as soon as the officers entered the property and smelled the strong odor, the totality of the circumstances created an objectively reasonable justification for the officers to enter the structure to prevent an explosion. *See Riley*, 134 S. Ct. at 2494.

The totality of the circumstances established that a child was in danger and that the structure could explode. These emergencies created the need to assist an individual threatened with imminent injury and the need to disable an immediately dangerous instrumentality. *Riley*, 134 S. Ct. at 2494. Accordingly, the officers entrance of the property and the structure fall within the exigent circumstances exception.

### III. CONCLUSION

Although the officers entered Tipton's property without a warrant, the evidence gathered during their search is admissible because *both* the consent exception and the exigent circumstances exception to the Fourth Amendment warrant requirement apply.

For the reasons stated on the record during the evidentiary hearing and the reasons stated above, it is ordered that Defendant's motion (DE 12) is denied.

Dated July 21, 2015.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY